## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-170

CHRISTOPHER HUGHLEY

  Plaintiff,

v.

MICHAEL O'DONNELL;
SCOTT HUGHES;
ETHAN ANTONSON;
THEODORE BINET;
SPENCER GROVE;
EDWARD ARNOLD; AND
CITY AND COUNTY OF DENVER.

  Defendants.

---

### COMPLAINT AND JURY DEMAND

---

  Plaintiff Christopher Hughley, by and through his attorneys Tyrone Glover and Helen Oh of TYRONE GLOVER LAW, LLC, respectfully submits this Complaint and Jury Demand and alleges as follows:

### INTRODUCTION

  1. This Complaint seeks accountability from law enforcement officials who blatantly exceeded their authority in demanding the seizure of Plaintiff Christopher Hughley's personal property without a legal basis, and arresting, jailing, and prosecuting him when he had not committed any crime.

2.   Around 10:45 a.m. in January of 2021, Mr. Hughley went to Cheeseman Park in Denver, Colorado to attend a political protest as a medic. The protest had yet to begin and the park was largely quiet and empty.

3.   Immediately upon entering the park, Mr. Hughley was stopped by Defendants and other police officers who demanded the seizure of Mr. Hughley's pepper spray, which was holstered in his belt. When Mr. Hughley refused, Defendants immediately arrested him.

4.   Mr. Hughley remained in jail for the duration of the protest, was criminally prosecuted, and after a year of fighting his case, his case was dismissed by motion of his defense counsel. Mr. Hughley experienced pain and suffering and other damages as a result of Defendants' unconstitutional conduct.

JURISDICTION AND VENUE

5.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.   Venue is proper under 28 U.S.C. 1391(b).

PARTIES

7.   At the time of the allegations in this Complaint, Plaintiff Christopher Hughley was a resident of the State of Michigan but was living in Denver, Colorado.

8.   At all times relevant to this Complaint, Defendant Lieutenant Michael O'Donnell was a supervisory employee of DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Lieutenant. Defendant O'Donnell is sued in his

2

individual capacity.

9.     At all times relevant to this Complaint, Defendant Sergeant Scott Hughes was an employee of the DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Sergeant. Defendant Hughes is sued in his individual capacity.

10.     At all times relevant to this Complaint, Defendant Corporal Ethan Antonson was an employee of the DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Corporal. Defendant Antonson is sued in his individual capacity.

11.     At all times relevant to this Complaint, Defendant Detective Theodore Binet was an employee of the DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Detective. Defendant Binet is sued in his individual capacity.

12.     At all times relevant to this Complaint, Defendant Officer Spencer Grove was an employee of the DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Officer. Defendant Grove is sued in his individual capacity.

13.     At all times relevant to this Complaint, Defendant Sergeant Edward Arnold was an employee of the DPD and acting within the scope of his employment and under color of state law in his capacity as DPD Sergeant. Defendant Arnold is sued in his individual capacity.

14.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. The DPD is an agency of the Defendant City and County of Denver, and all actions of the DPD are the legal responsibility of the City and County of Denver. Denver is sued on the basis of its customs, policies, and practices which gave rise to Plaintiff's federal rights claims.

15.     At all material times herein, Defendant Denver was responsible for supervising,

enacting, and enforcing the DPD's conduct, policies, and practices, and for the supervision and training of DPD officers and agents.

F<span style="font-variant:small-caps">ACTS</span>

### Mr. Hughley is a Community Organizer Who Planned to Attend a Lawful, Political Protest as a Medic

16.     On Wednesday, January 20, 2021, the day of President Joe Biden's inauguration, rallies were expected to occur in downtown Denver around 11:00 a.m. and noon by individuals and members of a variety of political groups and ideologies.

17.     One such rally was organized by and/or had support from the Denver Communists, the Denver Anti-Fascist League, Occupy Denver, We The People 303, Front Range Mutual Aid Network, Native Lives Matter, and several other organizations. These organizations planned to demonstrate in solidarity against the dangers of fascism and authoritarianism and in support of governmental accountability.

18.     Plaintiff Christopher Hughley is the founder and lead organizer of the Denver-based social justice advocacy organization, We The People 303. The organization provides support and mutual aid for the unhoused, organizes to end police violence, supports indigenous communities, promotes gender and LGBTQIA equality, and supports many other social causes.

19.     Mr. Hughley possesses training and certifications for medical response assistance, including CPR and First Aid, AED, CBRN (Chemical, Biological, Radiological, Nuclear) Response, and others.

20.     On January 20, 2021 around 10:45 a.m., Mr. Hughley went to Cheeseman Park with two other members of We The People 303 to participate in the protest in support of mutual aid

and solidarity against anti-authoritarianism and anti-racism.

21.     Mr. Hughley and his two comrades arrived at Cheeseman Park about an hour in advance of the start of the protest.

22.     One of the individuals present with Mr. Hughley was on the social media team of We The People 303 and was livestreaming the gathering and protest. He carried only his camera and mini tripod in his hands. He was dressed in a white sweater, black pants, and a scarf or bandana that covered his head and mouth.

23.     The other individual present with Mr. Hughley was also a member of We The People 303. He wore a backpack and was dressed in a black sweater and black pants, and wore a fabric mask over his nose and mouth as a COVID-precaution.

24.     Mr. Hughley attended the protest as a medic. He wore a small pouch across his front torso that bore a large red cross across the front, and inside the cross was a silver pendant with the inscription "emergency medical services." He was dressed in beige cargo pants, a black shirt, and a black tactical vest, and wore a mask over his nose and mouth as a COVID-precaution.

25.     Based on his experience of being attacked while providing medical assistance at protests in the past, Mr. Hughley carried a can of bear spray for self-defense purposes, which hung from his belt fully enclosed in a holster.

26.     Bear spray is a slightly more potent type of pepper spray. There are no laws in the State of Colorado or City and County of Denver that restrict the purchasing or carrying of pepper spray, bear spray, and mace.

### Defendants Unreasonably Demanded the Seizure of Plaintiff's Personal Property and then Arrested Him Without Probable Cause

27.     Law enforcement personnel from DPD's Tactical (TAC) units and the Special Operations Response Team (SORT) were assigned to monitor and police the protests in Denver that day, including at Cheeseman Park and the Capitol building.

28.     Sometime before or around 10:30 a.m., over a dozen DPD officers arrived at Cheeseman Park, including Defendants Lieutenant O'Donnell, Sergeant Hughes, Corporal Antonson, Detective Binet, Officer Grove, and Sergeant Arnold (collectively, "Individual Defendants").

29.     Individual Defendants and all officers present were fully armed and dressed in tactical gear.

30.     Cheeseman Park is a public park and a traditional public forum under the First Amendment of the U.S. Constitution and Article II, Sections 10 and 24 of the Colorado Constitution.

31.     Defendant Lieutenant O'Donnell gave an order to all law enforcement personnel assigned to Cheeseman Park, including Defendants Hughes, Antonson, Binet, Grove, and Arnold to *contact individuals going to Cheeseman Park who appeared to be Antifa members, and who appeared to be carrying items and backpacks that looked to hold rocks, cans, bottles, fireworks, guns, knives, shields, helmets, and mace*. Defendant O'Donnell's orders were to seize the listed items and take them to the police station to inventory, where they could be retrieved by protestors within thirty days.

32.     Antifa is a contraction of the phrase "anti-facist." Antifa is a decentralized, leaderless political movement composed of loose collections of groups, networks, and individuals

who campaign or rally against actions they view as fascist, authoritarian, racist, homophobic, and oppressive.

33.     When Mr. Hughley and his two comrades arrived at Cheeseman Park, the gathering had not yet begun. The park was largely quiet and empty.

34.     At no point was Mr. Hughley or his comrades being violent, disruptive, or threatening.

35.     Upon merely walking into Cheeseman Park, Mr. Hughley and his comrades were quickly approached by at least six officers, including Defendants Hughes, Antonson, Binet, Grove, and Arnold.

36.     Defendant Hughes stated aloud that Mr. Hughley's comrade was wearing a gas mask, which they were going to confiscate. Another officer stated that they believed that Mr. Hughley had mace.

37.     Mr. Hughley calmly stood in place and began recording the officers with his cell phone. When he heard the officer's comment about his pepper spray, Mr. Hughley stated aloud that it was his personal property and that the officers did not have permission to touch it.

38.     Mr. Hughley and his comrades were now surrounded by at least six officers, including Defendants Hughes, Antonson, Binet, Grove, and Arnold.

39.     Mr. Hughley was not free to leave the encounter upon being surrounded by these officers.

40.     Several officers grabbed Mr. Hughley's comrade – the one who officers previously alleged was wearing a gas mask – and frisked him. This comrade remained calm and compliant.

41.     Mr. Hughley's comrade was in fact <u>not</u> wearing a gas mask, nor did his mask appear to look like a gas mask. He wore a regular black face mace (a nose and mouth covering) as a COVID precaution.

42.     Mr. Hughley continued to stand in place and did not obstruct the officers. He recorded what he believed were Defendants' and other DPD officers' unlawful actions with his cell phone.

43.     While standing in place, Mr. Hughley stated aloud that he was carrying medical supplies. He also expressed his belief that the officers were harassing them.

44.     After hearing this comment, Defendant Hughes turned to Mr. Hughley and said, *were going to get that*, while pointing to Mr. Hughley's pepper spray that was still fully enclosed and hanging from a holster in his belt. Defendant Hughes stated that Mr. Hughley could retrieve it later.

45.     Mr. Hughley calmly responded that he knew his rights and continued to record the officers.

46.     While Mr. Hughley was still talking, Defendant Hughes, who sounded irritated and tempered, declared, *you're going to go to jail*.

47.     Still standing calmly in place, Mr. Hughley reasserted that he knew his rights and that the officers could not arrest him for having the bear spray.

48.     While Mr. Hughley was still talking, Defendant Hughes abruptly gave the order to arrest Mr. Hughley. Defendants Antonson and Grove, who were standing behind Mr. Hughley, grabbed Mr. Hughley's arms and placed him in handcuffs.

49.    Mr. Hughley did not resist being handcuffed.

50.    Appalled by his arrest, Mr. Hughley stated, *you can't arrest me for that.* Defendant Hughes responded, *yeah, we're gonna arrest you.* Still stunned, Mr. Hughley again stated, *you can't arrest me for that.* Defendant Hughes retorted, *for refusing a command, you will be arrested.*

51.    Defendants Antonson, Grove, Binet, and Arnold stood around Mr. Hughley throughout the encounter, listened to Defendant Hughes and his unlawful orders, knew that his orders were unlawful, and failed to intervene. Instead, they stood, watched, encouraged, and followed through with Defendant Hughes' illegal orders.

52.    While Mr. Hughley was handcuffed and detained, Defendant Antonson conducted a search of Mr. Hughley and his property. Mr. Hughley's property was seized and taken as evidence.

53.    Still in handcuffs and after being escorted to the patrol car, Mr. Hughley, understandably upset, repeatedly told the officers that they had no right to do what they were doing.

54.    Mr. Hughley stated in disbelief that he was told by other DPD officers in the past that he could lawfully possess and carry bear spray or any form of pepper spray.

55.    After hearing Mr. Hughley's complaints, Defendant Hughes told Mr. Hughley, *you don't want to listen.* Mr. Hughley responded, *you told me to hand it to you, and that's the only thing you said. And I said I don't have to.* Defendant Hughes responded, *and then you got hostile.* The conversation ended without any further explanation by Defendant Hughes or any other Individual Defendant of a lawful basis for Mr. Hughley's arrest.

56. From the moment Defendants approached Mr. Hughley to the point in which Defendant Hughes ordered his arrest, twenty-nine seconds elapsed.

57. Mr. Hughley was taken to the Denver city jail, where he remained in custody for four to six hours until he was released on his own recognizance.

58. Because he was in custody, Mr. Hughley missed the entirety of the protests that day.

**Mr. Hughley's Prosecution and Dismissal of Criminal Case**

59. Mr. Hughley was charged with violating the Denver Revised Municipal Code, Section § 38-125(b) which states, "[i]t shall be unlawful for any person to possess any noxious substance, or dangerous or deadly weapon as defined in DRMC § 38-117 with the intent to use the noxious substance or dangerous or deadly weapon for defeating crowd dispersal measures."

60. On August 31, 2021, Mr. Hughley's defense counsel filed a Motion to Suppress all Statements and Evidence Unlawfully Obtained and a Motion to Dismiss for a Violation of Substantive Due Process. A motions hearing was held on October 8, 2021.

61. On February 8, 2022 – after fighting his case for 385 days – Judge Andre Rudolph granted both motions in favor of Mr. Hughley, thereby dismissing the case. In granting the motion to suppress, the court determined that there was no probable cause for Mr. Hughley's arrest, and that the officer's order given to Mr. Hughley—that he relinquish his bear spray, a self-defense tool that is unregulated in the state of Colorado and in Denver—was unlawful.

62. The court further granted the motion to dismiss and found that the ordinance as applied to Mr. Hughley violated the Due Process Clause considering its overly broad and

vague scope, and Mr. Hughley's lawful possession of bear spray. The court was highly concerned with the officers' arbitrary enforcement of the ordinance as applied to Mr. Hughley. The court found that the officers' enforced the ordinance against Mr. Hughley discriminatorily and without fair notice in violation of the Due Process Clause.

### Defendants' Violated Mr. Hughley's Constitutional Rights

63.     At no point in time did Mr. Hughley violate any law, threaten any officer or other person, or engage or plan to engage in any act of violence.

64.     At no point in time did Mr. Hughley use or threaten to use his bear spray against the officers or others.

65.     At all times during this encounter, Mr. Hughley's bear spray remained in his holster.

66.     At all times during the encounter, Mr. Hughley was engaged in constitutionally protected speech and assembly in a traditional public forum under the United States and Colorado Constitutions.

67.     Mr. Hughley was stopped and immediately detained by Defendants Hughes, Antonson, Grove, and Arnold without reasonable suspicion or probable cause to believe that he was armed and had committed or was committing any crime.

68.     Defendants Hughes, Antonson, Binet, Grove, and Arnold stopped and immediately detained Mr. Hughley and his comrades under a false suspicion that they may be Antifa members.

69.     Defendants Hughes demanded the seizure of Mr. Hughley's bear spray without

any reasonable nexus between his possessing it and any alleged criminal behavior.

70.     The only "crime" alleged by Defendants was Mr. Hughley's rightful refusal to re-linquish his personal property, which he had a lawful right to possess and carry and which was not being used in furtherance of a crime.

71.     Defendant Hughes' was visibly annoyed by Mr. Hughley's assertion of his rights and exercise of his protected speech, and in response, retaliated against him by immediately ordering his arrest in violation of the First Amendment and Colorado Constitution Article II, Sections 10 and 24.

72.     Defendant Hughes' order that the officers would take Mr. Hughley's pepper spray without any reasonable nexus that it was used or would be used in the commission of a crime violated Mr. Hughley's right to be free from the unreasonable seizure of his personal property under the Fourth Amendment to the U.S. Constitution and Colorado Constitution Article II, Section 7.

73.     Defendants Grove, Antonson, Binet, and Arnold knew that Mr. Hughley had not violated any law and that he was exercising his protected speech and assembly rights, yet they assisted in arresting, searching, and jailing Mr. Hughley in retaliation for his exercise of protected speech.

74.     Individual Defendants violated Mr. Hughley's right to be free from the unreasonable seizure of his personal property under the Fourth Amendment and Colorado Constitution Article II, Section 7 by giving and enforcing the order to seize his bear spray without demonstrating any nexus between his lawful possession of this item and its unlawful use.

75.     The orders issued by Defendant O'Donnell and enforced by all Defendants, and the authority on which those orders were based, failed to provide Mr. Hughley and people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized and encouraged arbitrary and/or discriminatory enforcement.

76.     Individual Defendants violated Mr. Hughley's right to Due Process under the Fourteenth Amendment and Colorado Constitution Article II, Section 25 by giving and enforcing Defendant O'Donnell's sweepingly vague and overbroad order without clear and measurable standards by which Mr. Hughley and others could act lawfully.

77.     Individual Defendants violated Mr. Hughley's rights under the First Amendment and Colorado Constitution Article II, Sections 10 and 25 when they stopped, detained, and arrested Mr. Hughley for *potentially appearing to be an Antifa member*.

78.     This discriminatory targeting of Mr. Hughley and others on the basis of a perceived political ideology was a viewpoint-based restriction under the First Amendment and Article II Sections 10 and 24 of the Colorado Constitution, and Defendants' actions failed to meet strict scrutiny.

79.     Individual Defendants violated Mr. Hughley's rights under the First Amendment and Colorado Constitution Article II, Sections 10 and 24 when they retaliated against Mr. Hughley by arresting him for his protected speech when he objected to the officers' unlawful actions.

80.     Individual Defendants further violated Mr. Hughley's rights under the First Amendment and Colorado Constitution Article II, Sections 10 and 25 when they stopped his speech, arrested him, and jailed him for four to six hours. As a result, Mr. Hughley missed the

entirety of the protests and was denied the right to free speech, association, and assembly.

81.     The acts described herein were done by Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard of Mr. Hughley's constitutionally protected rights.

82.     Defendants were deliberately indifferent to the First, Fourth, and Fourteenth Amendment protected rights, and Colorado Constitution Article II, Sections 7, 10, and 25 protected rights of Plaintiff and persons in Denver, which proximately caused the violation of Mr. Hughley's constitutional rights.

### Defendant Denver's Unconstitutional Customs, Policies, and/or Practices

83.     Defendant Denver and Individual Defendants (collectively, "Defendants") engaged in repeated, widespread violations of law against protest-goers throughout the course of that day, stopping and immediately frisking protest-goers without a reasonable suspicion that they may be armed and dangerous, seizing personal property without any nexus to an alleged crime, and stifling the right to peaceably assemble and protest.

84.     Defendant O'Donnell's orders for the day were given to all DPD law enforcement personnel stationed at Cheeseman Park, including Individual Defendants, who enforced these orders arbitrarily, unreasonably, and repeatedly throughout the day.

85.     In Defendants' bodyworn-camera footage, at least three other individuals who arrived at Cheeseman Park were, like Mr. Hughley and his comrades, immediately stopped upon entering the park, surrounded, had their hands placed behind their backs, frisked, and searched without reasonable suspicion or probable cause that they were committing any crime. Two of

them had items confiscated without any reasonable nexus that those items would be used in furtherance of a crime.

86.     One of these individuals was wearing black jeans and a sweater with a grey beanie on his head and a bandana to cover his nose and mouth. He carried a backpack on his back. He was immediately stopped and frisked by DPD officers without reasonable suspicion. His backpack was then searched by a DPD officer. After he was searched, the officers allowed him to leave.

87.     Another individual carried a medic bag and wore black pants, a black sweater, a black tactical vest, and a winter facemask. He had a gas mask hanging from his belt. He was immediately stopped and frisked by DPD officers. After searching him, the officers confiscated his gas mask and multitool and told him that he could retrieve those items from inventory within thirty days. After he was searched and the specific items seized, the officers allowed him to leave.

88.     A third individual was wearing what appeared to be a snowboarding helmet with goggles and a black sweater and black pants. He carried a backpack on his back. DPD officers confiscated his helmet, searched his backpack, explained that he could retrieve the helmet within thirty days, and allowed him to leave.

89.     These additional violations happened to be captured on Individual Defendants' bodyworn-camera in passing in the span of a few minutes, however Defendants were ordered to take these unlawful actions for the entirety of the protest and presumably took these same actions with many other protestors over the span of hours.

90.     Defendant Denver's repeated widespread and unlawful acts over the course of the day constitute an unlawful custom and policy of violating protest-participants' constitutional

rights.

91.     Defendant Denver knew and understood, prior to the protests, that timely and complete protest search and seizure training was essential for officer accountability and transparency, upholding constitutional rights, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual.

92.     Defendant Denver failed to train its officers in the constitutional responses to search and seizure of persons and personal property related to peaceful demonstrations despite the history of such violations in the past and obvious need for such training. The recurrence of these same violations over the course of the day with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

93.     Defendant Denver's failure to provide adequate supervision, training, or policies that were obviously needed to lawfully detain, frisk, search, and seize peaceful protestors and their personal property constituted deliberate indifference.

94.     Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals' constitutional rights, like Mr. Hughley's, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of unreasonable search and seizure of persons and property and interfering with the right to participate in a protest.

95.     Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protests by authorizing, both explicitly and implicitly: the detention, frisk, and search of protestors who potentially appeared to be Antifa and/or carried backpacks or

possessed self-defense tools; and the blanket seizure of items that could potentially be used as weapons, including items that are legal to carry without restriction such as cans, bottles, or mace, without any nexus that they may be used for criminal activity.

96.     Defendant Denver and its final policymakers approved and ratified Defendant O'Donnell's orders for the day as described herein.

97.     Defendants committed these illegal actions repeatedly and with approval from Defendant O'Donnell and final policymakers for DPD.

98.     Upon information and belief, DPD Chief of Police Paul Pazen was fully knowledgeable and apprised of DPD's action plan for monitoring and policing the inauguration day protests, whereby he and DPD policymakers authorized and ratified the orders from Defendant O'Donnell.

99.     The violations of the constitutional rights of Mr. Hughley were a direct result of Defendant Denver's unconstitutional policies, practices, or widespread customs.

100.    The actions of Defendants as described herein deprived Mr. Hughley of the rights, privileges, liberties, and immunities secured by the federal and state constitutions, and caused him pain, suffering, emotional distress, and other damages.

### Statement of Claims For Relief

### First Claim for Relief
C.R.S. § 13-21-131
Colo. Const. Art. II, Section 7 – Unreasonable Seizure of Personal Property
(Against All Defendants)

101.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

102.    Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

103.    At all relevant times, Individual Defendants were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

104.    Plaintiff had a Colo. Const. Art. II, Section 7 protected interest against the unreasonable seizure of his personal property.

105.    Plaintiff possessed and carrier bear spray lawfully and for self-defense purposes.

106.    Plaintiff had violated no law when Defendants Hughes, Antonson, Binet, Grove, and Arnold stopped him and demanded he relinquish his bear spray.

107.    Defendants Hughes, Antonson, Binet, Grove, and Arnold did not have any reasonable nexus or basis to believe that Mr. Hughley carried bear spray for an illegal purpose.

108.    Defendant Hughes demanded the seizure of Plaintiff's bear spray without any reasonable basis to believe that Plaintiff used or was going to use it in furtherance of a crime.

109.    Despite Plaintiff's lawful refusal to relinquish his personal property which was not being used for any illegal purpose, Defendants Hughes, Antonson, Binet, Grove, and Arnold arrested Mr. Hughley and seized his personal property.

110.    Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

111.    The need for adequate training, policies, and supervision of officers on how to

handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

112.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

113.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

**Second Claim for Relief**
42 U.S.C. § 1983
**Fourth Amendment - Unreasonable Seizure of Personal Property**
**(Against All Defendants)**

114.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

115.    Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

116.    At all relevant times, Individual Defendants were "persons" under 42 U.S.C. § 1983.

117.    Plaintiff had a Fourth Amendment protected interest against the unreasonable seizure of his personal property.

118.    Plaintiff possessed and carrier bear spray lawfully and for self-defense purposes.

119.     Plaintiff had violated no law when Defendants Hughes, Antonson, Binet, Grove, and Arnold stopped him and demanded he relinquish his bear spray.

120.     Defendants Hughes, Antonson, Binet, Grove, and Arnold did not have any reasonable nexus or basis to believe that Mr. Hughley carried bear spray for an illegal purpose.

121.     Defendant Hughes demanded the seizure of Plaintiff's bear spray without any reasonable basis to believe that Plaintiff used or was going to use it in furtherance of a crime.

122.     Despite Plaintiff's lawful refusal to relinquish his personal property which was not being used for any illegal purpose, Defendants Hughes, Antonson, Binet, Grove, and Arnold arrested Mr. Hughley and seized his property.

123.     Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

124.     The need for adequate training, policies, and supervision of officers on how to handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights,  that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

125.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

126.     At the time of these allegations, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable

seizures of his personal property. Any reasonable law enforcement officer knew or should have known of this clearly established right.

127.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

**Third Claim for Relief**
C.R.S. § 13-21-131
**Colo. Const. Art. II, Section 7 – Unreasonable Seizure of Person / False Arrest**
**(Against Defendants Hughes, Antonson, Binet, Grove, and Arnold)**

128.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

129.    Defendants Hughes, Antonson, Binet, Grove, and Arnold acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

130.    At all relevant times, Defendants Hughes, Antonson, Binet, Grove, and Arnold were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

131.    Plaintiff had a Colo. Const. Art. II, Section 7 protected interest against his unreasonable seizure or arrest.

132.    Defendants Hughes, Antonson, Binet, Grove, and Arnold did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or was committing any violation of the law.

133.    Defendants Hughes, Antonson, Binet, Grove, and Arnold did not at any time have

a warrant authorizing any such seizure and detention of Plaintiff's bodies or belongings.

134.   Without probable cause that Plaintiff had committed or was going to commit any crime, Defendant Hughes ordered the arrest of Plaintiff.

135.   Defendants Antonson, Binet, Grove, and Arnold were present and assisting Defendant Hughes in the encounter and arrested or assisted in the arrest of Plaintiff knowing that there was no reasonable suspicion or probable cause that Plaintiff had committed any crime.

136.   Defendants Hughes, Antonson, Binet, Grove, and Arnold engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

137.   Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

## Fourth Claim for Relief
42 U.S.C. § 1983
### Fourth Amendment - Unreasonable Seizure of Person / False Arrest
(Against Defendants Hughes, Antonson, Binet, Grove, and Arnold)

138.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

139.   Defendants Hughes, Antonson, Binet, Grove, and Arnold acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

140.   At all relevant times, Defendants Hughes, Antonson, Binet, Grove, and Arnold

were "persons" under 42 U.S.C. § 1983.

141.    Plaintiff had a Fourth Amendment protected interest against the unreasonable seizure of his person.

142.    Defendants Hughes, Antonson, Binet, Grove, and Arnold did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or was committing any violation of the law prior to seizing and arresting him.

143.    Defendants Hughes, Antonson, Binet, Grove, and Arnold did not at any time have a warrant authorizing any such seizure and detention of Plaintiff's bodies or belongings.

144.    Without probable cause that Plaintiff had committed or was going to commit any crime, Defendant Hughes ordered the arrest of Plaintiff.

145.    Defendants Antonson, Binet, Grove, and Arnold were present and assisting Defendant Hughes in the encounter and arrested or assisted in the arrest of Plaintiff knowing that there was no reasonable suspicion or probable cause that Plaintiff committed any crime.

146.    Defendants Hughes, Antonson, Binet, Grove, and Arnold engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

147.    At the time of these allegations, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizure and arrest. Any reasonable law enforcement officer knew or should have known of this clearly established right.

148.     Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

### Fifth Claim for Relief
C.R.S. § 13-21-131
**Colo. Const. Art. II, Sections 10 and 24 – Free Speech and Assembly**
**(Against All Defendants)**

149.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

150.     Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

151.     At all relevant times, Individual Defendants were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

152.     Plaintiff was engaged in protected speech and assembly under the Colorado Constitution Article II, Sections 10 and 24 when he gathered at Cheeseman Park, a traditional public forum, for a political protest.

153.     Plaintiff's expression was on a matter of public concern and did not violate any law.

154.     Individual Defendants stopped Plaintiff from speaking and attending the protest by arresting and jailing Plaintiff without reasonable suspicion or probable cause that Plaintiff had committed or was going to commit any crime.

155.     Defendants' actions were a content-based and/or viewpoint-based restriction of

Plaintiff's expression.

156.     Defendants' actions were not a reasonable time, place, and manner restriction on Plaintiff's speech, association, or assembly.

157.     Defendants' actions in using the perceived political affiliations of Plaintiff and his comrades as a basis for detaining, searching, and demanding the seizure of their personal property was a content and or view-point based restriction on speech, association, and assembly.

158.     Defendant O'Donnell's orders were so vague that they failed to give notice of the conduct they proscribed, lending themselves to arbitrary and unreasonable enforcement against Plaintiff.

159.     Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

160.     The need for adequate training, policies, and supervision of officers on how to handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

161.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

162.     Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense

of security and individual dignity.

### Sixth Claim for Relief
### 42 U.S.C. § 1983
### First Amendment – Free Speech and Assembly
### (Against All Defendants)

163.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

164.   Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

165.   At all relevant times, Individual Defendants were "persons" under 42 U.S.C. § 1983.

166.   Plaintiff was engaged in protected speech and assembly under the First Amendment when he gathered at Cheeseman Park, a traditional public forum, for a political protest.

167.   Plaintiff's expression was on a matter of public concern and did not violate any law.

168.   Individual Defendants stopped Plaintiff from speaking and attending the protest by arresting and jailing Plaintiff without reasonable suspicion or probable cause that Plaintiff had committed or was going to commit any crime.

169.   Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

170.   Defendants' actions were not a reasonable time, place, and manner restriction on

Plaintiff's speech, association, or assembly.

171.    Defendants' actions in using the perceived political affiliations of Plaintiff and his comrades as a basis for detaining, searching, and demanding the seizure of their personal property was a content and or view-point based restriction on speech, association, and assembly.

172.    Defendant O'Donnell's orders were so vague that they failed to give notice of the conduct they proscribed, lending themselves to arbitrary and unreasonable enforcement against Plaintiff.

173.    Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

174.    The need for adequate training, policies, and supervision of officers on how to handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

175.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

176.    At the time of these allegations, Plaintiff had a clearly established constitutional right under the First Amendment to the U.S. Constitution to gather for a political protest, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

177.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

### Seventh Claim for Relief
C.R.S. § 13-21-131
**Colo. Const. Art. II, Sections 10 – Free Speech Retaliation**
**(Against Defendants Hughes, Antonson, Binet, Grove, and Arnold)**

178.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

179.    Defendants Hughes, Antonson, Binet, Grove, and Arnold acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

180.    At all relevant times, Defendants Hughes, Antonson, Binet, Grove, and Arnold were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

181.    Plaintiff was engaged in protected speech and assembly under the Colorado Constitution Article II, Sections 10 and 24 when he gathered at Cheeseman Park, a traditional public forum, for a political protest.

182.    Plaintiff's assembly and expression were on a matter of public concern and did not violate any law.

183.    Plaintiff's remarks to Defendants Hughes, Antonson, Binet, Grove, and Arnold that he believed that the officers were harassing him and his comrades, and his refusal to relinquish his personal property, while not violating any law, were protected speech and

expression under the Colorado Constitution.

184.    Defendants Hughes, Antonson, Binet, Grove, and Arnold jointly and on their own accord responded to Plaintiff's protected speech and expression with retaliation by immediately arresting and jailing Plaintiff without reasonable suspicion or probable cause that Plaintiff had committed or was going to commit any crime.

185.    The actions of Defendants Hughes, Antonson, Binet, Grove, and Arnold in arresting and jailing Plaintiff were based on Plaintiff's exercise of protected speech and would chill a reasonable person from engaging in protected speech.

186.    Defendants' actions were not a reasonable time, place, and manner restriction on Plaintiff's speech, association, or assembly.

187.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

188.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

<u>Eighth Claim for Relief</u>
42 U.S.C. § 1983
First Amendment – Free Speech Retaliation
(Against Defendants Hughes, Antonson, Binet, Grove, and Arnold)

189.    Defendants Hughes, Antonson, Binet, Grove, and Arnold acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

190.    At all relevant times, Defendants Hughes, Antonson, Binet, Grove, and Arnold

were "persons" under 42 U.S.C. § 1983.

191.     Plaintiff was engaged in protected speech and assembly under the First Amendment when he gathered at Cheeseman Park, a traditional public forum, for a political protest.

192.     Plaintiff's assembly and expression were on a matter of public concern and did not violate any law.

193.     Plaintiff's remarks to Defendants Hughes, Antonson, Binet, Grove, and Arnold that he believed that the officers were harassing him and his comrades, and his refusal to relinquish his personal property, while not violating any law, were protected speech and expression under the First Amendment.

194.     Defendants Hughes, Antonson, Binet, Grove, and Arnold jointly and on their own accord responded to Plaintiff's protected speech and expression with retaliation by immediately arresting and jailing Plaintiff without reasonable suspicion or probable cause that Plaintiff had committed or was going to commit any crime.

195.     The actions of Defendants Hughes, Antonson, Binet, Grove, and Arnold in arresting and jailing Plaintiff were based on Plaintiff's exercise of protected speech and would chill a reasonable person from engaging in protected speech.

196.     Defendants' actions were not a reasonable time, place, and manner restriction on Plaintiff's speech, association, or assembly.

197.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

198.    At the time of these allegations, Plaintiff had a clearly established constitutional right under the First Amendment to the U.S. Constitution to gather for a political protest and speak freely without retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

199.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

### Ninth Claim for Relief
C.R.S. § 13-21-131
Colo. Const. Art. II, Sections 25 – Due Process
(Against All Defendants)

200.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

201.    Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

202.    At all relevant times, Individual Defendants were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

203.    Plaintiff had a Colo. Const. Art. II, Section 25 protected interest against the deprivation of life, liberty, and property without due process of law.

204.    The orders issued by Defendant O'Donnell and the authority on which those were based were vague and not clearly defined.

205.    The orders issued by Defendant O'Donnell and the authority on which those

orders were based offered no clear and measurable standard by which Plaintiff and others could act lawfully.

206.    Individual Defendants failed to demonstrate of a reasonable nexus between Plaintiff's personal property to be seized and alleged criminal activity.

207.    Individual Defendants lacked legal authority to order the relinquishment of, and seize Plaintiff's lawfully possessed personal property.

208.    The orders issued by Defendant O'Donnell and enforced by Defendants, and the authority on which those orders were based, failed to provide Plaintiff and people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized and encouraged arbitrary and/or discriminatory enforcement.

209.    Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

210.    Defendant Denver and its final policymakers approved and ratified Defendant O'Donnell's orders for the day as described herein.

211.    The need for adequate training, policies, and supervision of officers on how to handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

212.    Defendants engaged in their conduct intentionally, knowingly, willfully,

wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

213.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

### Tenth Claim for Relief
### 42 U.S.C. § 1983
### Fourteenth Amendment – Due Process
### (Against All Defendants)

214.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

215.    The Individual Defendants acted under color of state law and within the course and scope of their employment as DPD law enforcement officers at all times relevant to the allegations in this Complaint.

216.    At all relevant times, the Individual Defendants were "persons" under 42 U.S.C. § 1983.

217.    Plaintiff had a Fourteenth Amendment protected interest against the deprivation of life, liberty, and property without due process of law.

218.    The orders issued by Defendant O'Donnell and the authority on which those were based were vague and not clearly defined.

219.    The orders issued by Defendant O'Donnell and the authority on which those orders were based offered no clear and measurable standard by which Plaintiff and others could act lawfully.

220.    Individual Defendants failed to demonstrate of a reasonable nexus between

Plaintiff's personal property to be seized and alleged criminal activity.

221.    Individual Defendants lacked legal authority to order the relinquishment of, and seize Plaintiff's lawfully possessed personal property.

222.    The orders issued by Defendant O'Donnell and enforced by Defendants, and the authority on which those orders were based, failed to provide Plaintiff and people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized and encouraged arbitrary and/or discriminatory enforcement.

223.    Defendant Denver is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices or customs of the relevant policymakers for Defendant Denver.

224.    Defendant Denver and its final policymakers approved and ratified Defendant O'Donnell's orders for the day as described herein.

225.    The need for adequate training, policies, and supervision of officers on how to handle the search and seizure of peaceful protestors and their personal property, which the lack thereof was obvious to result in the violation of protestors' constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

226.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

227.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense

of security and individual dignity.

### Eleventh Claim for Relief
### 42 U.S.C. § 1983
### Fourteenth Amendment - Malicious Prosecution
### (Against All Defendants)

228.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

229.     Individual Defendants did not at any time have a reasonable basis or probable cause to believe that Plaintiff was violating any law, obstructing or resisting any officer, or using or intending to use personal property in the commission of a crime.

230.     Individual Defendants, acting without probable cause, procured a groundless charge against Plaintiff of unlawfully possessing a noxious substance with the intent to use it for defeating crowd dispersal measures, Denver Revised Municipal Code, Section § 38-125(b), in order to maliciously bring about Plaintiff's criminal prosecution.

231.     Defendants, acting knowingly, maliciously, willfully and wantonly participated in the institution of legal proceedings against Plaintiff, including promoting the continued criminal prosecution of Plaintiff with knowledge that there were no reasonable grounds to believe that Plaintiff had committed any crime whatsoever.

232.     Defendants acted knowingly, maliciously, willfully and wantonly by accusing Plaintiff of unlawful behavior prior to, and during his unlawful arrest.

233.     Without any legal basis to do so, Defendants participated in the malicious prosecution of Plaintiff.

234.     Plaintiff spent four to six hours incarcerated before he was released on his own

recognizance.

235.    After over a year of Mr. Hughley defending against this charge, it was dismissed by motion of his defense counsel after the court granted his Motion to Suppress Evidence and Motion to Dismiss for Violations of Substantive Due Process.

236.    Defendants were motivated by an improper purpose to punish Plaintiff for opposing their unlawful conduct, in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

237.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

238.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages, including fear, emotional distress, loss of enjoyment of life, and loss of sense of security and individual dignity.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to:

a.    All appropriate relief at law and equity;

b.    Appropriate declaratory and other injunctive and/or equitable relief;

c.    Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

    d.   All economic losses on all claims allowed by law;

    e.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

    f.   Attorney's fees and the costs associated with this action under 42 U.S.C. § 1988 and C.R.S. § 13-21-131, including expert witness fees, on all claims allowed by law;

    g.   Pre- and post-judgment interest at the lawful rate; and

    h.   Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this January 19, 2023.

                                               Tyrone Glover Law, LLC

                                             *s/ Helen Oh*

                                             _____

                                             Helen Oh #54056
                                             Tyrone Glover #41529
                                             Tyrone Glover Law, LLC
                                             2590 Walnut Street
                                             Denver, CO 80205
                                             tyrone@tyroneglover.com
                                             helen@tyroneglover.com
                                             Phone: 303-577-1655

                                             Attorneys for Plaintiff